May it please the court, my name is Alan Brabender and I represent the U.S. Fish and Wildlife Service. I am joined at council table today by attorneys for the states of Montana and Wyoming and also the Safari Club. These attorneys are here to answer any questions that this court may have but they do not intend to make an affirmative presentation. I'm also joined by Mr. Tom France of the National Wildlife Federation. He will be using four minutes of argument time today to state his position. So I'll be using 26 out of the 30 minutes allocated to the appellants and I'd like to reserve 10 of those for rebuttal. All right, you have to manage your own time. Okay, thank you. This case involves the U.S. Fish and Wildlife Service's final rule, removing the greater Yellowstone population of the grizzly bear from the Endangered Species Act. Excuse me, could you speak a little more loudly and slowly? I moved the mic up just a bit. Sure. And the Endangered Species Act, is this better? Yes. And the Endangered Species Act federally protects threatened and endangered species but the goal of the act is to recover those species to the point where the act's protections are no longer necessary and then to remove them from the list and return the management back to the states. So success in the Endangered Species Act context is measured by recoveries and removals. And since recovery efforts for the grizzly bear began in about 1983, the population has made a remarkable comeback. It has grown somewhere between 4 and 7 percent each year, increasing from about 200 in 1983 to about 550 in 2006. It has expanded its range by 50 percent in the Yellowstone area and it has met all recovery goals. It is a success story. It is a recovered population also that no longer meets the definition of threatened under any of the factors listed at section 4a of the act. And the service recently issued the final rule, removing the population from the act's threatened list. Now the Greater Yellowstone Coalition, the Apelli, disagrees. It believes the, it disagrees with the final rule and it believes that this recovered population is still threatened by the inadequacy of existing regulatory mechanisms and also by the anticipated decline in whitebark pie. Counsel, let me ask you a question about how those two issues relate to one another. If we were to conclude that the district court was correct as to either one of those issues, would we have to reach the other one or are they independent bases? They are independent bases, your honor. Let me begin with the section 4a factor, the inadequacy of the existing regulatory mechanisms, and let me explain what this phrase means and what it does not mean. It doesn't mean that all uncertainty facing the species must be eliminated through regulatory mechanisms. It only means that the service should consider whether the existing regulatory mechanisms are so inadequate as to threaten the population. And when making this determination, the service should consider all rules, principles, and methods designed to protect the population, those that are judicially enforceable and those that are not. The coalition is wrong that the phrase regulatory mechanisms is limited only to judicially enforceable laws and regulations. If that were the standard, then the ESA or the Endangered Species Act itself would not be a regulatory mechanism because many of its provisions provide the service with discretion. Counsel, is there any other example of the type of intergovernmental and interagency cooperation that has equaled what I see in the record in this case? No. This, in fact, I think has set the standard for cooperation amongst the state agencies, the federal agencies, as well as the general public. It struck me from reading the record that we have almost an ideal situation here in the sense that a substantial amount of the acreage in the proposed recovery area is owned or controlled by the federal government. And I guess the question I have for you, maybe also for your opponents, is if this kind of a cooperative agreement cannot work to achieve the recovery of a species, then what will work? I think that's exactly right. If this isn't good enough, it's hard to imagine what would be good enough, Your Honor. To require state legislatures or Congress to enact judicially enforceable laws and regulations before the service may delist a species is to set an impossibly high standard, or at least an unrealistic standard, that will likely never be met. And because success in the Endangered Species Act context is measured by removals, this standard ensures that the act will be deemed a failure. I may have missed this in the record, but can you tell me how you propose to regulate hunting or other activities on the tribal lands? Each state, or I'm sorry, each tribe, or the tribe I think has developed its own management plan. Is that part of the record? No, it's not part of the record. The only thing I saw is in Idaho, which indicated that the tribes would come up with hunting regulations on their own. Is that the state of the record? That is the state of the record. So we don't know? You don't know. And what percentage of the land is tribal land? It is approximately 2 or 3 percent. And the service addressed this issue in the final rule, and it found that because such a small percentage of the habitat is on tribal land, it doesn't pose a threat to the species. Now, if I may return to the phrase regulatory mechanisms, the important part of that phrase is the subject noun, which is mechanisms. And a mechanism is something broader than simply just a law or a regulation. It is defined as an arrangement of parts designed to produce an effect, and the effect here is the maintenance of a recovered population of grizzly bears in the Yellowstone area. And even the adjective regulatory in its verb form doesn't support the coalition's argument. It simply means to control by rules, principles, or methods. So while the phrase regulatory mechanism certainly includes things such as judicially enforceable laws and regulations, it isn't limited to only those things. It is a broad term meant to allow the service to consider all rules, principles, and methods designed to produce an effect, such as the maintenance of a population of grizzly bears in the Yellowstone area. And we know it's supposed to be given a broad meaning because the legislative history indicates so. Congress stated that it used broad terms in Section 4A in order to allow the service to consider all pertinent information when making a determination under Section 4A. So let's assume in the future that the three states allow, and they intend to excessive. I assume then the remedy is to go through the formal petitioning for relisting, and that's the only option the federal government has? Or am I wrong on that? Well, if the species is threatened as a result of the amount of hunting, then yes, the remedy would be to relist the population. That's correct, Your Honor. How does the MOU play into Judge Thomas's question? Well, through the agreement, the states have promised to follow the mortality limits and the population standard in the strategy. And among other things, what the strategy does is it's an agreement to manage the population at no less than 500 bears. And just because the species is removed from the Act's protection doesn't mean that somebody can kill a grizzly bear any time they want to. Under the laws of each state, you need a permit to do so, with very few exceptions, such as in self-defense. And even the Endangered Species Act contains a provision that allows you to kill an endangered species in self-defense. I guess the question that I'm wrestling with here, as I understand the arguments on the other side, would be that if the various monitoring mechanisms show that the population of bears is being dramatically reduced below or above acceptable mortality levels through hunting, what remedy is there to, in essence, get the states to stop issuing bear hunting permits? Well, the states have promised to follow the mortality limits, and there's nothing to indicate at this point that the states are not going to follow those mortality limits. That's not the question, though. If they don't, what can be done? And if they don't, the remedy is to re-list the population, if there is a suspicion. And how long does that take, typically? Well, it can be done so on an emergency basis, and all the service has to be... Right. No, but I said typically. Well, it takes, I think there's a deadline of six months or something like that. And you start with scientific evidence and a petition, and then... Right. You have to follow a notice and comment rulemaking procedure, so it takes some... I'd say normally, wouldn't it? I think there's a six-month limit, but maybe it does take sometimes more than that, Your Honor. But, as I said, the service could re-list the population on an emergency basis, if that is necessary. And all you have to do there is publish notice in the Federal Register, and the species will be placed back on the list for a period of 240 days, while the service then follows the notice and comment rulemaking procedures. Counsel, I'm interested in having you address, before we've used up too much of your time, the food source question. And my first question with regard to that is that it appears from the material in the record that the availability of the pine nuts correlates with the reproductive capacity of the bears, which obviously relates to their numbers. And I did not see anything in the final rule that deals at all with the reproduction issue. Am I missing something? Is there something in the final rule that I didn't see? Well, the final rule addresses the Whitebark pine issue at 731 to 735. Right. My specific question is whether any of that analyzes the problem that's caused by the lower reproductive rate during the times when the pine nuts are not available. I think it is mentioned in the final rule, Your Honor. I don't know at what particular point in the final rule or what particular page, but it is mentioned there. And the service isn't required to discuss every single aspect of its decision-making process. All it needs to do is provide a concise general statement of the basis and purpose for the rule. And I think the service easily did that here by explaining in over 70 pages of the Federal Register the basis and purpose for the final rule removing species from the lake. Well, so is it your argument that long is equivalent to adequate no matter what's in it? Or is there, I mean, what you're saying is we talked for 70 pages and so it must be good enough? Well, no. What I'm saying is the service didn't entirely fail to consider this problem. It definitely... Well, how do we know that from the record? I think that's the question. Well, the problem is the lack of whitebark pine. That's the problem. And the service addressed that problem in the final rule. It might not have addressed every aspect in the detail that this Court would like, but that's not the standard. The service recognized that the whitebark, the declining availability of whitebark pine is a problem, and it addressed that problem. And there's ample evidence in the record to support the service's conclusion that the grizzly bears will be able to adapt to the decline in whitebark pine. And moreover, this Court's review is not based simply on... That's why I'm asking you about the reproduction, because as I understood the analysis, what the rule says is they'll find other things to eat so they won't starve to death. And that is certainly one criterion. But if they don't starve, but they don't reproduce, it seems to me like a disconnect between the... Not just... It just doesn't discuss what seemed to me to be perhaps one of the most critical aspects of the decline in the pine population. Well, the service absolutely addressed the declining population, part of which is the reduced capacity to produce bigger litters. And it did so by looking to the Schwartz data. The Schwartz data at pages 1001 and 1002 of the excerpts of record went back and looked at years when there was no whitebark pine available. And even in years when there was no whitebark pine, the grizzly bear continued to increase in size. The grizzly bear population continued to increase in size, even when there was no whitebark pine available. And that certainly includes, or that takes into account, the smaller litter sizes. And these increasing populations are not unusual. The Northern Continental Divide population also suffered through a permanent and dramatic decline in whitebark pine in the 1950s. And that population also has continued to grow. Yes, but I noted in your citation to that in the record, it was only a citation to a fact sheet. What's the scientific basis for that? Well, this Court's... I'm just talking about your brief. When you cited... When you said that in your brief and you cited to the excerpts, there was a... The only citation was to a fact sheet. Do you know the underlying... Well, if that's the case, it's also discussed in the final rule, Your Honor. Right, but that didn't... It didn't illuminate me any further. You don't know the underlying basis for that contention. Well, the underlying basis is the surface's knowledge. I mean, the people who are dealing... It says in the fact sheet, it goes on to say that there are differences between northern and Yellowstone populations because the northern population of grizzlies has a different food source. And it says we don't know what it means with the elimination of the food source in the Yellowstone region. I mean, that's what it says. I'm not making it up. I don't doubt that you're not making that up, Your Honor. But the problem is not... I'm just asking to expand on that particular citation. Do you have any further response? It's covered in the final rule, Your Honor. That's... When you say it's covered in the final rule, I'm looking at page 14,930 of volume 72 of the Federal Register. And it talks about the various studies that have been done and the fact that the grizzly is an opportunistic omnivore. And it says, we believe that this intensive annual monitoring of foods, grizzly bear human conflict, survival rates for young, reproductive rates, and the in the strategy will provide the strategy's signatory agencies with a strong and biologically defensible foundation from which to implement the adaptive management actions necessary to respond to ecological changes that may impact the future of the GYA grizzly bear DPS. And I guess the concern that we're having here is besides reading the words that says we'll change our management strategy, what more has the agency committed itself to do? And how... It seems to me that the district court found a disconnect between that statement and looking at the underlying studies that the service was relying on for the decline of the whitebark pine. Well, as the service admitted, there is some uncertainty as to the whitebark pine issue. But the act contemplates that there will always be some uncertainty, Your Honor. The act in the face of uncertainty requires the service to monitor the listed population for a period of at least five years and to use its emergency listing authority if appropriate. I'm unsure what you mean by the information in the final rule and elsewhere that there is a decline in the whitebark pine. That's not uncertain. It's happening. The extent of it is uncertain. It also appears certain that in the times when those nuts are not available, there's an increase in human encounters, which in turn increases mortality. That's also not uncertain. And it appears that you've also agreed that at least in terms of the size of litters, there's an adverse effect on reproduction. So where's the uncertainty? Well, the uncertainty is whether there... is how the grizzly bear population as a whole will respond. And the service concluded that the population as a whole will be able to adapt to the decline. Right, but that's just by going farther out into the We don't have any data in here that shows what chronic shortages the pine nuts will have. No, there absolutely is data. And that's that Schwartz study. Schwartz looked at what happens to the population in years when there are no whitebarks. I said chronic. I mean, the Schwartz data, as I understand it, is about the generalized population. The other data shows that every other year or so, we have a lot of availability of the pine nuts. But there hasn't been a period of chronic shortage. No, there has, especially during the four or five years. Well, there has been a chronic shortage right after the Yellowstone fire. And the Schwartz data takes that into account. Even in years when there are no whitebark pine nuts available, the grizzly bear population increases in size. And the effects on the population are felt year by year. It's not appropriate to aggregate them. There's either going to be a conflict in the fall that year, or there isn't. Or there's going to be a smaller litter size in a particular female that year, or there isn't. It's not appropriate to aggregate the effects year to year. And what Schwartz shows is that even when there are no whitebark pine nuts available, and you can't get any worse than having no whitebark pine nuts available, the population continues to increase. Okay, I'm confused about that because I understood the record to say, and I may be misremembering this because there's a lot of material here, that in years without whitebark pine, the population decreased. But in years with whitebark pine, it increased more so that on average, it continued to increase, which is a little bit different. No, no, no. That's the coalition's argument that you're saying. I thought there was evidence in the record to that effect. No, there isn't. They're relying on a study, Peace and Madsen, that is no longer considered to be the best available science. The Schwartz study, which is considered to be the best available science, shows that even in years when there are no whitebark pine nuts available, the population increases. Now, the rate of increase has declined somewhat, but the population trajectory still continues on an upward slope. And you're saying that's what the studies showed after the Great Yellowstone Fire? Well, that study takes into account many years, including the years involved in the Great Yellowstone Fire, Your Honor. And that was when? It's somewhere in the record. Yeah, it's somewhere in the record. I don't remember, Your Honor. But it was during the time that Schwartz was studying whitebark pine production? That's correct. Those were years when no whitebark pine was available, and those were the years that Schwartz took into account in his study. Which of the Schwartz studies are you talking about? Excuse me? Which of the Schwartz studies are you talking about? It's the one at 1001 and 1002 of the excerpts of record, Your Honor. Okay. That's about eight minutes. Do you want to... Yes, if I could yield some time to the National Wildlife Federation. May it please the Court. My name is Tom France, and I'm here today representing the National Wildlife Federation of Wyoming. By way of background, the National Wildlife Federation was established in 1936 when Franklin Delano Roosevelt convened conservationists from across the country to take on the challenges posed by the Dust Bowl. One result was a recognition that a national conservation organization was needed, and so NWF was created. Today, we're celebrating our 75th anniversary of protecting wildlife for our children's future. Over the years, we've often appealed to the federal courts to protect America's wildlife. We've most often done this as plaintiffs, seeking enforcement of federal environmental laws or to stop federal agencies from harming wildlife. The decision we made to intervene in this case as a defendant was not lightly made, but I want to explain a little bit of why. Fundamentally, since 1973, we've worked with federal and state agencies in the greater Yellowstone to restore and recover grizzly bears. We've watched as federal and state agencies have worked to develop programs that have brought about a remarkable recovery of grizzly bears. Since the mid-1990s, NWF and the NGOs here, federal and state agencies, local governments, state fish and wildlife agencies have worked to create the conservation strategy. It's a many-layered document that two national parks, two national wildlife refuges, and three and many local jurisdictions. While the complexity of the plan and the many jurisdictions involved necessitated a great deal of give and take, the process that brought it about created a great deal of cooperation, really a remarkable degree of cooperation, and a shared vision of a future landscape that has a healthy grizzly bear population occupying it. As we noted on brief, this court should recognize what it is adhering today as well as what it is. There is a massive record in this case. There are millions of facts. The discussion you just had with the federal counsel mirrors conversations that have occurred in the northern Rockies for years between biologists and hunters and anglers and conservationists and environmentalists speculating about the grizzly bear population. We're down to two narrow issues. You're not hearing disputes about population. You're not hearing disputes about habitats occupied. Instead, we're focused on two important questions, but they're the result of years and years of work to find common solutions to the problems posed by managing a large carnivore on an enormous landscape. The basic concerns being voiced today is that the progress that has continued because of circumstances that might or might not occur. Both plaintiff and the district court adopted a worst-case scenario structure built on a worst-case scenario foundation. The foundation is that whitebark pine may disappear entirely from the Yellowstone. The structure is that two of the most adaptable mammals ever to walk the face of the earth won't be able to adapt to this change. One of those mammals is the grizzly bear. The other is a human society that has built a recovery program that has resulted in four to seven percent population growth of the bears for many, many years and how we sustain that going forward. Against a backdrop of a growing human population, increased human development in the greater Yellowstone, a changing forest ecology that has included dramatic firestorms, declines in certain species, increases in abundance in others, we've seen a grizzly bear population that has grown steadily. We've seen bears occupying habitats from which they've been absent for decades and we've seen the grizzly bear research team document consistently high reproductive rates and bears an excellent physical condition. These are indicators of a highly secure population exploiting rich habitats. No one really disputes these facts and the wildlife success story that this represents really shouldn't result in a legal defeat for the agencies that created. The Endangered Species Act was constructed to promote the recovery of listed species and not their static management. In part, the ESA seeks to animate federal and state agencies by promising a reward when populations recover. In the case of the Yellowstone grizzly, I think the record shows overwhelming that the ESA has worked exactly as Congress has intended. If the district court's opinion is sustained, there will be no reward. Instead, both the agencies and I think most importantly the publics in Montana and Idaho and Wyoming will feel they've been penalized, that the goalposts have been moved, and that the ESA doesn't work. I think that this is really an record that demonstrates an agency and agencies wrestling with an enormous amount of science, giving that science their best judgments in terms of how to move it forward, and the result has been something that the publics of Montana and Idaho and Wyoming represented something they're really proud of and really want to see go forward. I just will remark on the question that Judge Thomas asked about the hunting. I have been trying to get a moose permit in Montana for about 15 years and I haven't succeeded because the moose population is so small that there are a handful of permits issued every year. There's no question that the state agencies in Montana and Wyoming and Idaho may want to have a hunting season, but there's absolutely no doubt that it will be closely regulated and that none of those agencies want to participate in any sort of relisting of grizzly bears in the northern Rockies. Thank you very much. And good luck with your moose permit application next year. May it please the court, I'm Douglas Honnold on behalf of the Greater Yellowstone Coalition. There are two big issues. Let me jump in with the regulatory mechanisms argument first. Why are regulatory mechanisms important in this case? Grizzlies were originally listed as a threatened species in the lower 48 states because of runaway human-caused grizzly bear mortality and because habitat was being degraded by the acre and there needed to be regulatory mechanisms to prevent those issues. That was in the original 1975 listing of the species as threatened in the that habitat management and controlling human-caused grizzly bear mortality are the most important means to achieve recovery and thereby justify delisting. In the ESA listing context, the evaluation of binding measures to prevent excessive mortality and habitat degradation occurs under section 4A1D's now what should be familiar formulation, the inadequacy of appeal raises a statutory construction question of first impression in the court of appeals. Counsel, the statute contains no definition of regulatory mechanisms and we have to face initially the question of what level of deference, if any, do we accord to the deference we owe? I think this is a Chevron step one case. I think that the phrase regulatory mechanism has to mean, if the English language means anything, it has to mean those actions that control, restrict, or regulate activity, not carte blanche, do as you want. So are you conceding or agreeing that Chevron deference would otherwise be owed and if so, why would it be Chevron and not something less? Well, I think it falls, the interpretation of this phrase falls either under Chevron step one or Chevron step two analysis. I believe that this is a Chevron step one case and that we win under Chevron step one. Right, but if it's a step two case. If it's a step two case, I also believe that we win because I don't think it's a plausible reading of the statute to interpret the phrase regulatory mechanism to mean anything that the Fish and Wildlife Service wants to throw into the hopper of considerations of whether there are adequate regulatory mechanisms. The reason I'm looking, I guess, quizzical or I'm thinking hard is that in this instance there was no rulemaking or formal conversation about the meaning of that phrase as distinct from very extensive rulemaking about grizzly bears. And I'm still puzzling over in my own mind why this is the case. I'm not saying that there's a ambiguity in the statute, which I know you don't concede. Well, there is no Fish and Wildlife Service generic apply to all species regulatory rulemaking interpretation of that phrase by virtue of an ESA specific regulation. I don't think For any regulation, I mean, I think the point is, at what point do we owe Chevron deference and at what point do we owe Skidmore deference? Do you have any response to that or not? The only response I have to offer is that we believe this falls into a Chevron step one, follow the law, the law is clear, regulatory mechanisms means those activities that restrict or control actions. Well, the other question I have for you on this part of the case then is, even if we were to look to your proposed definition of regulatory mechanisms, there is an extensive web of what for this purpose I'll call real mandatory law. And even if we were to look only to those aspects of what controls problems for the grizzly bears, why wouldn't the services answer still be a real regulation to protect them? I don't think there's any real regulation. The regulations that are cited, and much of this goes back to the conservation strategy, and it has a 10-page description of a whole suite of 73 laws that there's quite a bit of briefing about. And then it has a chart in Appendix J that lists the five listing criteria of the ESA, and it has a column for the Factor D regulatory mechanism. The only way to know that Fish and Wildlife Service thought that this was a regulatory mechanism is to look at the Appendix J chart and see which box is checked with an X. You have one major piece of federal legislation, the Lacey Act, which essentially makes the game that's taken in violation of state law a federal crime. I guess my concern is that with that long laundry list of regulations, your argument doesn't seem to take into account the interplay between state and federal regulations, particularly within the umbrella of the Memorandum of Understanding, which as I understand it is unparalleled in the history of attempting to recover species under the Endangered Species Act. Well, you may be hearing the story that it's unparalleled, but I assure you in the wolf delisting context, the same theme is played. So there are many unparalleled measures. But the bottom line is, if you look behind the curtain and you look at these laws, the laws don't say you can't take activity that degrade habitat, you can't take actions that prevent grizzly bear mortality. They are measures that say, yes, the Forest Service has the But what's missing is a regulatory mechanism that commits them to doing good things, necessary things that are necessary to control grizzly bear mortality, much of which hunting is an issue, but much of this occurs just because of the way grizzly bears are on the landscape. So we should accord no weight whatsoever to the workings of this interagency group that has spent 20 or 30 years working together and has now formally committed by signing the Memorandum of Understanding, that basically that's a meaningless document. Is that what your position is? It's absolutely legally meaningless. And in fact, they concede that and the district court so found in evaluating whether there was anything that would bind the parties to the agreement. What if the day after delisting, the state of Wyoming sets a hunt of 50 grizzly bears? There's absolutely nothing in that agreement that says the mortality. Yes, precisely. Precisely. And that's my point. And then why couldn't the federal government bring an action to enjoin that as a violation of this agreement? If you think the conservation agreement is enforceable in that way. But it's a contract, is it not? Why couldn't it be enforced like any other contract? A contract against the federal government given sovereign immunity, etc. This is not a contract. I'm saying bringing an action. The federal government would bring the action against a signatory, say the Wyoming Department of Game or whatever the name of the agency is that would issue the permit in joining the issuance of 50 permits for bear. Well, if you read the conservation strategy in the memorandum of understanding, it says that it doesn't bind the regulatory authority of the state to act. So I don't think there's anything there to enforce. That's the problem. So the fact that Wyoming's Department of Game has signed the agreement, which includes an obligation to abide by the mortality levels, is completely meaningless. It does not include an obligation. It includes an aspiration only. The remedy is to relist. The remedy is to relist, and species have gone extinct waiting to be relisted. And the relisting process, while there are statutory provisions that would require listing in response to a petition, the Fish and Wildlife Service also has, with respect to other grizzly bear populations, delayed listing of the cabinet yak population, we cite this in our brief, even though they found that it was biologically  Council, I have the same question for you as I had for opposing council about the relationship between the two issues that are in front of us. If we were, just for the sake of argument, to agree with you on either number one or number two, would we have to reach the other issue? No, you would not. They operate independently. And you had other issues you presented before the district court, and the district court didn't reach for those reasons. But I gather you didn't cross appeal, and those issues aren't before us now. We didn't cross appeal for the tactical reason that we thought we would have more than enough to respond to, and I think that was a wise choice. We have read a lot. We could read more. I wish it were something other than one brief against nine. Well, why isn't, even assuming for the sake of argument, that there's nothing enforceable about the MOU? Here we have three agencies, and the primary concern with the states is the hunting, right? No. The bulk of the mortality occurs just under regular management. Right. Let's just take hunting. But each state has a regulatory mechanism on hunting and permitting and so forth. Well, the additive pile-on mortality of hunting is something that the states authorize. But the actions that relate to, say, road building and oil and gas activity on U.S. Forest Service lands, which is really, from a geography standpoint, the most important chunks of land are owned by and managed by the U.S. government through U.S. Forest Service. So there, the state has no power and authority to regulate development activities, and that turns on, are there binding regulations that would govern development on Forest Service land? And so while we have a Forest Service commitment, it's driven through the Forest Service planning regulations, which basically deprive the Forest Service of the ability to make such commitments. So there, too, we don't have a binding commitment on a really key piece of the puzzle. And it is an interlocking situation where we do need states to take action and make binding commitments on things they control, and we need federal agencies to make binding commitments on things they control. And that has not happened. So is your solution, then, it's going to require legislation by Congress to, in essence,  if there's a totally voluntary agreement that's conditioned on the reservation of discretion, then I don't think that that gets the job done in terms of something that is a regulation, that is a regulatory mechanism that controls. Counsel, you're not answering my question. It's a very simple question. Is the only solution, then, for Congress to enact a comprehensive federal statute? No, absolutely not. Well, what else can they do besides what they've done? A state could have a law or regulation that commits to maintain X number of bears and Y habitat that is a firm either commitment by being embodied in a law or regulation. The U.S. Forest Service could have regulations that are, if it changed its rules, which currently make everything discretionary, but under the old rules, previously, it had standards that were enforceable and were mandatory. Those have been repealed. But if it had such a provision and it had a grizzly bear regulation that mandated that the habitat would be maintained, then those would be two essential pieces that would be Didn't the superintendents of the two national parks do that in their plans? Do what? What you're just talking about, making a commitment to the agency. They did not, by rulemaking, take such an action. They modified their plans. And you don't think that's good enough? What happens in the two national parks is really, those are preserved areas where very few bears die. That's the gold standard. But we're talking about a fairly significant part of the primary conservation area, are we not? Yellowstone is a very large park. It's a two million acre park, but it's a safe haven for bears. It's the land outside of the park that's not a safe haven. So is your answer, that's okay for that two million, but we've got 17 million other acres that we have to worry about? Yellowstone National Park is not subject to extractive industry development, road building of the sorts, improper food storage, or the whole suite of things that create actual on the ground conflicts between humans and grizzly bears. So what it needs is a different analysis than lands that are open for development and that pose real threats and that there are recognized conflicts. So is your answer, that little island is okay, but the island is too small for the entire population at issue here? Or are you saying that's not good enough either? Yellowstone Park is fine. It's not good enough. Yellowstone Park cannot maintain 500 grizzly bears, which is the service's objective, or anywhere near it. Okay, but we're talking about the adequacy of regulatory mechanisms. That's the issue that I'm wrestling with. And by your answer, I can't even get you to concede that what the park superintendents have done in Yellowstone and Grand Teton is adequate enough to protect the population of the bears within the confines of those national parks. I thought that I was clear, but let me try again. It's not what the supervisors did. It's the fact that you have a law of Congress that dictates on land management in a park that makes it a wildlife preserve and prevents the kind of developments and activities that would injure grizzly bears either via hunting or by development of the landscape. So is your answer that with regard to the land within those parks, the existing regulatory mechanisms are adequate? Yes. Thank you. So if we get to look down the road, I mean, and given the uncertainty in state regulations, I mean, I think the realistic, you're not going to find any of these states that are going to prohibit grizzly bear taking, absolutely no hunting, none of these regulations are going to meet your standard in the states, although they have a very small percentage of the pie. At what point does the grizzly bear population get to before you can say, well, it should be delisted regardless of the regulatory ambiguities? Do you have a figure? Is it 600 bears? Are you asking if there were a sufficient buffer above and beyond a minimum population level, what that buffer might be? Yes. Well, at this point, the service has said 500 is good enough. We challenge that. I think that the best available science is contrary to that decision. That's not an issue on appeal, however. That's correct. But I was answering the judge's question about how many bears is enough. Well, I mean, I think it eventually gets to this, is that until it reaches a level that you think is appropriate, you don't think that any of these mechanisms are going to work, right? I mean, that's your solution in the long run, is the bear population has to get up to 800 or 1,000. No. If we have a number, we do dispute 500. Yes, I understand. But if there were 500 bears, and in this appeal, if those bears were protected by regulatory mechanisms, which is an independent listing factor, then that would be satisfactory. But we don't think that when you actually scrutinize what the laws and regulations and things that would control or constrain actions are, we don't think there's anything that doesn't breathe discretion into every poor and really essentially says, this is what we're going to do. And if the wheels fall off the wagon, this is what we're going to do. And we're going to make a firm commitment that's not entirely discretionary, which we decide when we get up the next morning what we're going to do. Given that most of this land is federal, and listening to your argument, it seems like most of your criticism is really directed to the Forest Service, right? Let me give you a hypothetical. If the Forest Service had adequate regulatory mechanisms in place, I take it that the fact that the states have only given a general commitment really would not make much of a difference. Is that true? It's a multi-dimensional chess game. That it requires controlling human activities that sometimes the states have jurisdiction and sometimes the federal government has jurisdiction. One of the biggest issues, because it's somewhat of a circular argument that suitable habitat, according to Fish and Wildlife Service, is federal land per se. They developed a screen, so it's circular. But it is true that we have Yellowstone Park at the core, surrounded by U.S. Forest Service lands, and the bulk of those lands in the recovery zone are Forest Service lands, and that from a land management standpoint, that's where the action is. And in terms of development activities like roading and logging and oil and gas development and those kinds of things, the Forest Service has to step up to the plate. But here it's the U.S. Fish and Wildlife Service that is obligated legally to evaluate whether the Forest Service has done so, and that's what we challenge here. I want to address one thing that came up in the briefing that I've not had an opportunity to respond to, which is in the Fish and Wildlife Service reply brief in the penultimate sentence, they make the unsupported statement, and I quote, that the grizzly bear population, quote, has continued to increase at about 4.8 percent each year since delisting. Now, this is prejudicial. It needs a response. It is, even though it is an unsupported extra record evidence, extra record claim. And when I asked of government counsel if they could provide a single piece of paper that had the 4.8 percent number, none was provided. We put in, in the district court below, Rule 59 evidence as to remedy only that documented in 2008 that there were 48 documented dead grizzly bears in Yellowstone, and according to the agency scientists, that they estimated that there were 79 dead bears in 2008 alone. In 2010, there were an additional 49, just last year, 49 dead grizzly bears. They haven't yet released the calculation of the estimated dead bears, but assuming that it's comparable, we're talking about 160 dead bears out of a population of somewhere between 500 and 600 bears, and I felt like I needed to respond to that, even though it is extra record, because it was an unsupported assertion in the government's brief. Now, let me turn to the whitebark pine issue. Yeah, let's go back to what's in the record. Can you address the mortality levels of the bears during the study period, particularly at that point after the Yellowstone fire, where the whitebark pine population was severely impacted by high-intensity fire? The assumption is incorrect. There was a widespread fire, but most of the whitebark pine was unaffected and remained extant and continued to produce cones, and part of the colloquy I want to straighten up is that, historically, what we have had with whitebark pine is that never are there no whitebark pine cones. Across a huge landscape, they take averages, and there are some areas, even in an individual year, there are some areas that are good, some areas that are average, some areas that are not so good. So the bears can travel to the areas where they're good, even in a bad year, and what the record shows, both with respect to fecundity and with respect to mortality, that when overall things are bad in terms of whitebark pine cone production, bears can rebound the next year when the cones are generally good by producing more cubs per litter and increasing the fecundity side or the cub production side of the equation. And when those were summed, Pease and Mattson found, and cited favorably by the Fish and Wildlife Service in the delisting rule, that it was the overall difference between a decreasing population in bad whitebark pine cone production years and an increasing one in good years. Counsel, the government's argument is that we can only consider the Schwartz data, or that we ought to consider the Schwartz data, because in their expert opinion, that's the most reliable scientific information. What is your view of what the Schwartz information demonstrates, in particular the pages that they cited us to, 1001 through 1002 of the excerpts? Right. Well, the Schwartz study did not segregate good years versus bad years. The government repeatedly asserts it. It just doesn't do that. If you read it, it just does not do that. It has a hypothetical modeling where it talks about zero and 7.5, and I believe it's 28 cones per tree per year. That's a hypothetical perspective analysis that is not based on what really happened. But the most important thing, the factor, the relevant factor that Fish and Wildlife Service blew right by, and Judge Thomas hit this on the nail previously, what we're looking at now is not this boom and bust cycle. The scenario that they needed to evaluate was what happens when there's a chronic, every year is a bad year, and there's no opportunity to rebound. That was not studied in the Schwartz, because it hadn't occurred, and in 2002, it was before the major die-off of whitebark pine. 2002 being the Schwartz report. The Schwartz study looked at years 1983 to 2002. It concluded in 2002. Most of the dead whitebark pine trees occurred because of this mountain pine beetle infestation that's wiped across the landscape since 2002. And the fungus as well, as I understood it. So it doesn't capture, because it was a look in the rear-view mirror, it doesn't look at the future scenario, which is what happens when every year is a bad year, and even in a bad year, there's no place that is a safe haven that has some whitebark pine. That's the doomsday scenario that we're experiencing. Unfortunately, most of the whitebark is dead now in Yellowstone Park, and I don't think it's an accident that the Lizzie Bear mortalities have skyrocketed in recent years, and we have a real problem. But the real problem is being swept under the rug, because the Fish and Wildlife Service is failing to address this unrelenting loss of whitebark pine, which is the key issue. There's a lot at stake in this appeal. There are important doctrinal issues regarding whether regulatory mechanisms means real regulation or just empty promises. But there are also on-the-ground impacts that are staggering. Yellowstone Park was the nation's first national park. People come from around the world to see grizzly bears. With the documented loss of whitebark pine, the road to recovery for Yellowstone grizzly bears has become a whole lot harder. Already isolated from other grizzly bear populations for over 100 years, which Fish and Wildlife Service plans to remedy by trucking bears in to deal with problems associated with genetic inbreeding, and struggling to survive energetically because the high plateau forested landscape with geysers and mudspots cannot compare to coastal grizzly bear areas that have robust salmon streams or places like Glacier Park where the berry crop is intense. Yellowstone grizzly bears must now contend with the loss of their most important food. The district court rightly determined that rather than face this issue, Fish and Wildlife Service sought to deny it and downplay its existence, irrationally ignoring or misconstruing most of the relevant science. The district court also rightly determined that Fish and Wildlife Service erred by placing enormous weight on the conservation strategy as a regulatory mechanism when, and I quote the district court, the strategy, quote, cannot actually regulate anything. What's the current status of the carrying on of the strategy? Is the monitoring continuing? Yes, your honor, the monitoring is continuing. So presumably then, even though we don't know what the numbers are because it's not officially in the record, the monitoring should be at least picking up all of the data that you're then expect some kind of a review to be triggered as a result in the MOU? Well there was a mini review in 2008 when the grizzly bear mortalities went through the roof. It didn't result in any changes and in 2010 we had a year that was even worse. One thing that was not in the briefing that I want to urge the court to look at is the service relies in the delisting rule on the 73 asserted laws and rules and regulations and yet when you go to appendix J and you count them up, there's 17 of those boxes that the service contended or concluded were not subsection D regulatory mechanisms. So by their own calculus, there's 17 out of the 73. They concede in the decision were not regulatory mechanisms but when it comes to the, or they concede in the conservation strategy but when it actually comes to the decision, the delisting rule, they're relying on all of those. If that isn't arbitrary decision making, I don't know what is. So we urge this court to affirm the district court so that if Fish and Wildlife Service still wants to proceed with delisting the Yellowstone grizzly bear, it at least does so in a new delisting rule that truly confronts the brave new world the Yellowstone grizzly bears face and provides a regulatory safety net that is equal to the task of protecting grizzly bears. Thank you. Thank you, counsel. I want you to put five minutes on the clock here. I don't, there we go. Just one second before you start. Yeah. All right. Thank you, Your Honor. Let me first address Judge Taller's question. We could bring an action against the State of Wyoming. The State of Wyoming's attorney informs me. In fact, we do that all the time. And to address the Chevron step two analysis, we do believe that Chevron is appropriate here, Your Honor. Why? Why wouldn't it be something lesser in view of the absence of true rulemaking to confront the question of statutory interpretation? Well, I think two things are relevant. First of all, that Congress delegated authority to interpret the act to the service, and that delegation is at 16 U.S.C. 1533G. And the service acted on that delegation here by relying on the conservation strategy in the final rule, which was subject to notice and comment rulemaking. No, but deference is something more than trying to discern through implication what an agency did. I mean, it's an important question, because it's a level of deference question. We just don't have a regulation here that the agency said this is what this means. You don't need a regulation, Your Honor. I'd refer this Court to the Martin versus- Well, you don't need it. Nobody's challenging, I don't think, at least my questions are not challenging the statutory authority of the agency to interpret. The question is, depending on the form in which the interpretation occurs, we have a different model, according to what the Supreme Court has told us, as to how much deference to give that interpretation. So it's a matter of degree. That's right. And I would refer this Court to the Martin versus Occupational Health and Safety Commission case decided by the Supreme Court in 1991, 499 U.S. 144. And there, the Supreme Court noted that interpretations that are within or inherent within agency actions are entitled to Chevron deference. It's formal enough to be given Chevron deference. I would also- Isn't that a pre-mead case, though, where the Court kind of laid it all out in a different way? The Supreme Court didn't overrule Martin in Mead, even if it is a pre-mead case. And also, the agency here- But why shouldn't we follow Mead, which is the more recent precedent? Well, there are two different lines of cases. I don't know that Mead is inconsistent with Martin or Martin is inconsistent with Mead. So you think they are inconsistent? No, I'm not saying that. I don't know if they are or not. And also, within the context of responding to comments here, in the formal notice and question, the Supreme Court, in its final decision, the Supreme Court, in its final decision, has put forth a very clear and necessary question regarding bonding and enforceable mechanisms, and it found that bonding and enforceable mechanisms are not necessary. Right. That was the comment? The response to comments? It was in response to comments. Yeah. Well, that's not Chevron deference. We don't afford Chevron deference to comments. No, it's the agency's response to comments. I know. I know. That appeared in the notice and comments.        I think it's a good question. I think the Supreme Court's decision to go with the United States Circuit, the decision in the name of the State of the State, is directly on that point. All right. Your Honor, I would still refer this Court to the Martin decision. And even if Chevron isn't appropriate here, some other form of deference should be given, whether it's Skidmore deference or court. Yeah. I assume your position is even if it's Skidmore, that you would — we owe you some deference and that would be enough. That's right. And it would be odd to ignore the service's interpretation here, since it is the agency that deals with this statute every day. Now let me address the extra record materials being relied on by the coalition. First of all, anything that happened after March 2007 isn't relevant to this case. This Court's job is to assess whether the service made an arbitrary and capricious determination based on the record that was before the agency at the time the agency made its decision. So anything that happens after March 2007 is not relevant to this case. And if the coalition believes the circumstances on the grounds of the court's decision that the agency made an arbitrary and capricious determination based on the record that was  case. And the last line of your reply brief is not relevant also? That's right. We only included that data to rebut this notion that mortality has skyrocketed since. Right. But we apply an even rule. And it hasn't. Yeah. You know, that was probably not the best way to end. Thank you, counsel. All right. Before we leave, I know we have a lot of attorneys here, and it's an important case. If you don't mind, would you come up and identify yourself for the record? We appreciate you traveling here from the various states, but just go ahead. Thank you, Your Honor. My name is Jay Gjerde.        Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Please, go ahead with your question. Your Honor, I'm Colby Howell. I handled all three district court litigation cases for the Phoenix. Your Honor, my name is Bill Schenck. I represent the state of Montana. Good morning. Doug burden. I represent Safari Club International. Thank you all for coming here. We'll go ahead, please. Thank you. I'm Jenny Harbine for the coalition. All right. Very good. Jack Taholski, Missoula, Montana, Greater Yellowstone Coalition. I handled the case at the district court. I'm Sean Halley, also representing the coalition. Well, thank you all for coming here, and it's an important case. We will take it under submission. Thank you.
judges: Thomas, Graber, Tallman